**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| In re | **RICHARD GIQUINTO** | : | **Chapter 7** |
| | **d/b/a BEAR BUILDERS,** | : | |
| | | : | **Bankruptcy No.  06-10953ELF** |
| | Debtor(s) | : | |

| | | |
|---|---|---|
| **ELAN STROMINGER,** | : | |
| | : | |
| Plaintiff(s) | : | |
| | : | |
| v. | : | |
| | : | |
| **RICHARD GIQUINTO,** | : | |
| | : | |
| Defendant(s) | : | **Adversary No. 06-0466** |

# M E M O R A N D U M   O P I N I O N

## I.  INTRODUCTION

On March 8, 2006, Debtor Richard Giquinto ("the Debtor"), a home improvement contractor, filed a chapter 7 bankruptcy petition.  Prior to the commencement of the bankruptcy case, Plaintiff Elan Strominger ("the Plaintiff ") obtained a money judgment against the Debtor in the amount of $80,549.00.  The judgment arises from a home improvement contract between the parties.

In this adversary proceeding, the Plaintiff requests that the debt be excepted from discharge under §523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. §523(a)(2)(A).  The Plaintiff contends that the Debtor fraudulently induced him to enter into their home improvement contract.  He accuses the Debtor of, among other things, misrepresenting his intentions, competence and ability to complete the work and of not disclosing the existence of disputes he

had with other homeowners who had retained him in the past.

In addition, the Plaintiff requests that the Debtor's bankruptcy discharge be denied under

11 U.S.C. §§ 727(a)(4)(A) and (D).  The Plaintiff contends that the Debtor was dilatory in his

disclosure of the existence of certain unsecured creditors, that he failed to provide the Trustee

with documentation of pending lawsuits and that this conduct justifies the denial of his discharge.

As elaborated below, I conclude that the Plaintiff has failed to meet his burden of proof

on all of the issues.  Accordingly, I will enter judgment for the Debtor and against the Plaintiff.


## II.  PROCEDURAL HISTORY

On October 2, 2006, the Plaintiff commenced this proceeding by filing an adversary

Complaint.  On May 7, 2007, the one-day trial of this matter was held and concluded.[1]  At trial,

the Plaintiff, his wife (Andrea Strominger), the Plaintiff's expert witness (Stephen Scherf)[2] and

the Debtor testified.  Four documents were admitted into evidence, all of them proffered by the

---

[1]    In addition to the claims described in the text above, the Complaint contained counts under 11 U.S.C. §523(a)(2)(B) (Count II), 11 U.S.C. §523(a)(4) (Count III) and 11 U.S.C. §707 (Count VI).  In his post-trial submission, the Plaintiff concedes that he presented no evidence at trial on these Counts.  See Plaintiff's Post-Trial Reply at 1-2 (stating that the Plaintiff presented evidence only in support of his §§523(a)(2)(A), 727(a)(4)(A) and 727(a)(4)(D) claims).  I conclude from this that the Plaintiff abandoned the other Counts of the Complaint.

[2]    Stephen Scherf is a certified public account, fraud examiner and forensic accountant and managing director at Executive Sounding Board Associates.  (N.T. at 81).  He testified that he was formerly a Chief Financial Officer for a construction company and a Senior Vice President of a financial institution.  (N.T. at 81).

Plaintiff.[3]  At the Plaintiff's request, and with no objection by the Debtor, I also took judicial

notice of certain bankruptcy filings.[4]

Following the trial, I took this matter under advisement and entered orders on May 9,

June 1 and June 27, 2007 to establish a post-trial briefing schedule.  (See Adversary Docket

Entry Nos. 29, 31 and 36).  The last post-trial submission, Plaintiff's Reply Brief, was filed on

September 7, 2007.  (See Adversary Docket Entry No. 40).  This matter is now ripe for

disposition.


### III.  FINDINGS OF FACT

Upon consideration of the testimony and exhibits admitted into evidence, the arguments

of counsel, the parties' joint statement of uncontested facts, the pleadings, the post-trial

---

[3]    See Exhibit P-1 (the Scope of Work Agreement), Exhibit P-2 (c.v. of Plaintiff's expert), Exhibit P-5 (the Debtor's Rule 2004 examination) and Exhibit P-6 (the Debtor's bankruptcy petition, schedules and Statement of Financial Affairs).

[4]    See N.T. at 221-230.  The documents include Bankruptcy Docket Entry Nos. 10 (the BNC certificate of service for the April 24, 2006 meeting of creditors), 14 (May 8, 2006 Objection to Discharge filed by James Spence), 17 (the BNC certificate of service for the Notice of Hearing with respect to the Spence Objection to Discharge), 19 (Reaffirmation Agreement between the Debtor and AmeriCredit), 21 (BNC certificate of service for the Order setting a hearing to determine whether the reaffirmation agreement would be approved), 24 (the U.S. Trustee's Motion to Dismiss Case or, in Alternative, to Extend Time to Dismiss Pursuant to 11 U.S.C. §707 and File a Complaint Seeking Denial of Discharge), 28 (BNC certificate of service relating to Bankruptcy Docket Entry No. 24), 37 (Notice of Appearance of Elan Strominger) and 39 (the Debtor's amended schedule F).

The Plaintiff's proffered reason for requesting judicial notice of these documents was that he wanted me to take notice of the fact that, as a consequence of being omitted from the Debtor's creditor matrix, certain of the Debtor's creditors were not served by the court with notice of various filings and hearings in the case.

memoranda and the relevant law, I make the following findings of fact.

Prior to seeking bankruptcy relief, the Debtor was a professional construction contractor who regularly performed residential renovation work in customer's homes. (See Complaint ¶8; Answer ¶8). He started a construction business in 1989. (N.T. at 291; Exhibit P-5 at 73). For his first eight years in this business, the Debtor primarily worked as a roofer. Then, from 1997 to approximately 2001, he branched out, working mainly as a subcontractor framing houses. (Exhibit P-5 at 18-22). By 2002, the Debtor had acquired general contracting work on a wide range of projects that included home improvement work, additions, decks, basements, windows and doors. (Exhibit P-5 at 21-22; 8-9). Between 2002 and 2004, the Debtor worked on approximately 50 projects. (N.T. at 296-7).

The Debtor first met with the Plaintiff[5] and his wife in December 2003. (N.T. at 27). At the time, the Strominger were in the midst of purchasing their current home at 22 Clare Drive in Newtown, Pennsylvania ("22 Clare Drive"),[6] and had decided that they wanted to have the basement of that home remodeled. (N.T. at 21). While it is unclear exactly how the Plaintiff came to learn about or decide to contact the Debtor about doing the basement remodeling work, he and the Debtor did meet several times before he hired the Debtor. (N.T. at 27).

During the course of pre-contract discussions, the Debtor advised the Plaintiff that "he had done . . . similar projects finishing basements" and that his work "had generally been

_____

[5]     The Plaintiff has a bachelor of science degree in Commerce and Engineering from Drexel University and is employed as an Operations Administrator for Susquehanna International Group. (N.T. at 73).

[6]     The closing on 22 Clare Drive occurred in January 2004. (N.T. at 18, 73, 75).

4

accepted as good quality." (N.T. at 28, 33). He also supplied the Plaintiff with the names of

three customers for whom he had previously done work as references. (N.T. at 33, 69). The

Plaintiff spoke with one of the three.[7] That customer, whom the Plaintiff believed had also had

basement refinishing work done, told the Plaintiff that he was satisfied with the Debtor's work.

(N.T. at 69).

In this same time period, the Plaintiff told the Debtor that it was important to him to have

the work in the basement finished by mid-April 2004, the date the Stromingers had targeted for

moving into their new home. (N.T. at 25, 32).[8] The Debtor told the Plaintiff he could have the

work completed by that time. (N.T. at 35). The agreement the parties eventually signed did not

contain a provision reflecting a time deadline for completion of the work. (See Exhibit P-1).

On January 7, 2004, the Plaintiff and the Debtor entered into a written agreement ("the

Scope of Work Agreement ") for Bear Builders, i.e., the trade name used by the Debtor in

operating his sole proprietorship,[9] to renovate the basement of 22 Clare Drive and for the

---

[7]       The Plaintiff testified he was not able to reach the other two customers. (N.T. at 69).

[8]       The Plaintiff testified that he and his wife have three small children and that they wished to avoid having major construction going on while the children were in the house. (N.T. at 32).

[9]       In 1994, the Debtor operated as "Giquinto Roofing and Siding." (Exhibit P-5 at 72). In 1997, motivated to change the perception that he primarily did roofing work and to branch into carpentry, the Debtor started doing business under the name "Bear Builders." (Exhibit P-5 at 8-9, 72-73; N.T. at 291).

The Plaintiff's expert testified that the Debtor had operated under additional business names: Giquinto Contractors, in October 1995, and Giquinto Contracting, in 1997. (N.T. at 210). The Debtor testified that he stopped working under the name "Giquinto" because

Plaintiff to pay a total price of $49,650.00.  (Statement of Uncontested Facts No. 6; Exhibit P-1).

The Scope of Work Agreement memorializes the contemplated work and payment schedule.

(Exhibit P-1).  The agreement broke the work down into 14 subparts.[10]  It also required the

_____

customers had difficulty pronouncing it and used Bear Builders because "Bear" was his family
nickname.  (N.T. at 295).

[10]     Those subparts include:

1) apply and receive all necessary permits;

2) frame out all exterior walls using 2 x 4 construction with pressure treated wood
attached to floor;

3) insulate exterior walls using r-13 insulation and plastic vapor barrier;

4) run all new electric throughout basement as per code, new recessed light kits
throughout, run new cable and telephone jacks, decor switches and outlets,
dimmers in theater room and over bar areas, run speaker wire throughout
basement for stereo and surround for theater (speakers not included);

5) frame out closets, half walls, full bathroom and shelving as per floor plan;

6) install new ½ inch drywall to all walls spackled, taped, sanded, primed and
painted;

7) install new trim matching trim used upstairs;

8) cap around steel columns and at ends of half walls to make nice square
columns with trim;

9) install new drop ceiling with 2' x 2' tiles white with white track;

10) install new battery back up system for sump;

11) new full bathroom with have full tub shower with tile to ceiling 36" vanity
and toilet with pump for bathroom, floor will be 12 x 12 ceramic tile which will
run out of bathroom from entry door around to bar area;

12) build new bar (glass block possible) with sink, price includes building of

6

Plaintiff to pay $2,650.00 at signing, $9,500.00 at the start, $9,500.00 after framing, $9,500.00 after rough plumbing and electric, $9,500.00 after drywall, and the balance upon completion. (See Exhibit P-1).

Work began promptly after execution of the Scope of Work Agreement. (N.T. at 24, 43). Two subcontractors who worked with Bear Builders were employed at 22 Clare Drive. (See N.T. at 29, 43-46 (identifying "Mike" and "Mal" as two such workers)). The Debtor worked at the job site in mid-April. (N.T. at 43; see also Answer, ¶13).

Through April 15, 2004, the Plaintiff paid the Debtor a total of $40,650.00 for the work Bear Builders performed. (See Statement of Uncontested Facts No. 9). This sum includes all progress payments due under the Scope of Work Agreement except for the final "balance upon completion" payment, i.e., $9,000.00. (See Exhibit P-1; N.T. at 293-4).

In mid to late April 2004, Bear Builders ceased continuous work. (N.T. at 43). Seeking an explanation, the Plaintiff called the Debtor, who said that there had been a death in his family.[11] He requested a "couple weeks" to "get his affairs in order." (N.T. at 43). The Plaintiff

---

bar but not granite for top. also build new table area between columns again does not include granite top;

13) install vents to hvac unit for heat and air conditioning to entire basement;

14) install new pading [sic] and burbur [sic] carpet to basement and steps (samples provided).

(Exhibit P-1).

[11]    The Plaintiff testified that there was an interim period of time -- he estimated a week to ten days -- before he received this particular phone call, when he and his wife made phone calls to the Debtor that the Debtor did not return. (N.T. at 43).

agreed.  (N.T. at 43).   Meanwhile, the Stromingers moved into 22 Clare Drive in April

notwithstanding the fact that the basement work had not been completed.  (N.T. at 73).

In mid-May, some work resumed.  A Bear Builders worker returned to the Strominger's

home to do what Plaintiff described as "light work" and painting. (N.T. at 43-46).  This worker

was on site for "couple of weeks."  (N.T. at 47).  At the same time this work was being done, the

Plaintiff and his wife were attempting, unsuccessfully, to reach the Debtor by phone and find out

when the Debtor would personally return to the site.  (N.T. at 44, 47).

In early June, the Debtor called the Plaintiff and advised him that the tiles required to

complete the dropped ceiling in the basement were on back order.  (N.T. at 44, 292-3).  There

was an "upgrade" associated with the tiles that apparently made them a special order item.  (N.T.

at 292).  The Debtor said he would return to finish the work when the tiles arrived.  (N.T. at 44,

293).

What eventually caused the parties' contractual relationship to terminate is sharply

disputed.[12]  The Debtor says he saved a voice message he received from the materials supplier

advising him that there was a further delay to the arrival of the tiles and played it back for Mrs.

Strominger.  (N.T. at 293).  He told her that the materials supplier subsequently promised him

that the tiles would arrive on a particular Thursday.  (N.T. at 293).  He says that Mrs. Strominger

told him that if the ceiling tiles did not arrive by that Thursday, he should not bother to return to

the job.  (N.T. at 293).  Conversely, Mrs. Strominger testified that she never told the Debtor not

---

[12]      The disposition of this adversary does not require me to resolve this dispute.  I
include each parties' version of how the contractual relationship came to an end to provide
chronological context.

to come back, and, to the contrary, called the Debtor several times to ask him to resume work but he never returned her calls. (N.T. at 75). In any event, when the ceiling tiles did not arrive by the Thursday the materials supplier had promised, the Debtor says that he assumed that he was fired. Either way, Bear Builders did not complete basement renovations at 22 Clare Drive. (N.T. at 26, 292-4).

When asked what items on the Scope of Work Agreement had <u>not</u> been completed by this time, the Plaintiff specified portions of six out of fourteen items,[13] leaving the inference that eight items had been completed. While the Debtor agreed with the Plaintiff that the dropped ceiling tiles were not installed, he disagreed with the Plaintiff's characterization of items 4, 14 and 12. (N.T. at 291-295).[14]

---

[13]    Those are:  item 4, except for the wiring, which he contends was completed but not to code; portions of item 9 (regarding installation of the drop ceiling tiles); item 10 (regarding installation of the battery back up for the sump pump); portions of item 11 (<u>i.e.</u>, that the rough plumbing in the basement bathroom was completed, but the fixtures were not installed); portions of item 12 (regarding the building of a glass block bar and new table area; the glass blocks were purchased, but the bar was never built); and item 14 (regarding the installation of padding and carpeting).  (N.T. at 66-7).

[14]    With respect to running electrical wiring through the basement, item 4 of the Scope of Work Agreement, the Plaintiff testified that the wire was run, but was not to code. (N.T. at 66).  Conversely, the Debtor testified that Middle Atlantic, a third party inspector, analyzed the wiring and announced that it passed inspection.  (N.T. at 291-92).  Additionally, the Plaintiff testified that the work in item 4 did not progress beyond the wiring stage.  (N.T. at 66). The Debtor testified that he completed all of the electrical work except for the actual light housing in the ceiling.  (N.T. at 291).

As to item 14, installation of carpeting and padding, the Plaintiff testified that the carpet and padding were <u>never</u> purchased or installed.  (N.T. at 66-7).  In contrast, the Debtor said that carpeting <u>was</u> installed and testified to having to complete all painting and baseboard trim in advance and having to spend a full day off the project while the carpet installers worked. (N.T. at 295).

On November 9, 2004, the Plaintiff filed suit against the Debtor in the Bucks County

Court of Common Pleas on a breach of contract theory. (Statement of Uncontested Facts No.

11). On or about January 6, 2005, that court entered a default judgment for $80,549.00.

(Statement of Uncontested Facts No. 12). The Plaintiff testified that this judgment resulted from

the Plaintiff's breach of contract suit for approximately $26,000.00 being tripled under

Pennsylvania's Unfair Trade Practices Act, 73 P.S. §§201-1, et seq. (N.T. at 55-6).

On March 8, 2006, the Debtor filed a chapter 7 petition for bankruptcy relief. (See

Bankruptcy Docket Entry No. 1).[15] He testified that he filed on a "24 hour basis." (N.T. at 298).

He said that the filing of his bankruptcy petition was precipitated by an upcoming sheriff's sale

and a pending construction job that had wiped him out financially. (N.T. at 298).

Some time after the Debtor filed for bankruptcy, the Plaintiff examined the Debtor's

schedules and pleadings in the main bankruptcy case. Through this process, he learned about

other homeowners who had asserted proofs of claim against the Debtor. (N.T. at 59). They

include:

1. **Lyn Anderson**, who hired the Debtor in 2002 to construct her home. The
Debtor apparently sued Ms. Anderson for nonpayment on a breach of
contract theory and she counterclaimed. (N.T. at 176, 181-83; Exhibit

---

The parties also disputed the extent to which item 12, the new bar, was built.
(Compare N.T. at 66 with N.T. at 294).

[15]    During the time when the Debtor's bankruptcy case was designated an asset case,
the Plaintiff filed a proof of claim for $80,549.00, the amount of the state court default judgment.
(See Proof of Claim No. 6). Subsequently, on June 4, 2007, the Trustee filed a Report of No
Distribution and Notice of Change From Asset to No Asset Case. (Bankruptcy Docket Entry No.
70).

P-5 at 50-52)[16];

2. **Geoffrey and Joanna Vaughn**, who filed a proof of claim for $15,085.00 for a debt incurred on March 15, 2004 allegedly due to "faulty construction, property damage"[17] on a basement remodeling project.  (Exhibit P-5 at 107-108);

3. **James Spence**, who apparently hired the Debtor in 2004 to add an addition to his home (Exhibit P-5 at 36-9) and who asserted a proof of claim for $8,110.50 for a November 2005 judgment;[18]

4. **James Steiner**, who filed a proof of claim for $4,993.50 for a judgment obtained on April 15, 2005 for "deposit for services"[19];

5. **Bonnie and Roger Stumpo**, by whom Debtor had been retained to do a second floor addition (Exhibit P-5 at 31-33) and who asserted a proof of claim for $67,000.00 for a debt incurred on January 10, 2006[20]; and

6. **Jeffrey and Elizabeth Tinney**, with whom the Debtor contracted to do basement construction work sometime in 2005 or 2006. (Exhibit P-5 at 109; N.T. at 219).[21]

---

[16]    Lyn Anderson and David Gavin filed a proof of claim for $262,381.00 asserting that this debt was caused by "construction damages and defects."  See Proof of Claim No. 2.

[17]    See Proof of Claim No. 4.

[18]    See Proof of Claim No. 11.

[19]    See Proof of Claim No. 10.

[20]    See Proof of Claim No. 8.

[21]    The Plaintiff presumably learned about the Tinneys from the Debtor's amended bankruptcy schedules.  (See Bankruptcy Docket Entry No. 39).

There was also testimony at trial about a suit by F&F Customer Builders.  (N.T. at

The Plaintiff also learned for the first time that the Debtor had filed for bankruptcy relief in

1997.  (N.T. at 42 (as to learning about bankruptcy); 299 (as to date of bankruptcy filing)).

Not all of the homeowners who filed proofs of claim in the Debtor's bankruptcy case

were disclosed in the Debtor's original schedules.  The Debtor's initial schedules and statement

of financial affairs disclosed the Plaintiff, Mr. Spence and Mr. Steiner as unsecured creditors.

(See Bankruptcy Docket Entry No. 1).  All of the above-referenced homeowners were disclosed

as unsecured creditors in the amended schedules the Debtor filed on July 20, 2006.  (See

Bankruptcy Docket Entry No. 39).

On September 7, 2006, the Debtor's Rule 2004 examination was taken.[22]  The Plaintiff

introduced the transcript from this examination into evidence at trial.  In it, the Debtor testified

about his work history, provided some information concerning the six homeowners mentioned

above and described his business model for Bear Builders.

At this examination, the Debtor was also asked how he managed Bear Builders' finances

while it was operational.  The Debtor said that he did not employ any office help or bookkeepers

and handled all of Bear Builders' finances, except for tax preparation, himself.  In doing so, he

did not use any sophisticated accounting procedures or keep formal ledgers.  (Exhibit P-5 at 10,

---

194).  Apparently, F&F were the original contractors that the Stumpos hired and, after the
Stumpos fired F&F and retained the Debtor, F&F sued the Debtor for tortious interference with
contract.  (Exhibit P-5 at 106-07).

[22]        Subsequently, on October 25, 2006, a Consent Order was entered extending the
time to file a complaint seeking the denial of the Debtor's discharge to November 25, 2006.  (See
Bankruptcy Docket Entry No. 60).

24, 29, 66).[23]  He also did not produce any financial statements.  (Id.).  He worked solely from

Bear Builder's checkbook and receipts.  (Exhibit P-5 at 24).  He employed an accountant only at

tax time.[24]

Finally, at his 2004 examination, the Debtor was asked why he ultimately failed to make

a "decent" profit.  (Exhibit P-5 at 23).  Speaking in hindsight, the Debtor attributed the demise of

Bear Builders to, among other things, his lack of skilled financial management, underpricing

contracts, increased materials costs, his perception that he could not renegotiate existing

contracts when material costs increased beyond what was contemplated in the original contract,

and to his occasionally having taken on more work than he could handle.  (Exhibit P-5 at 23, 33).

He also testified, however, that before he accepted a construction job, he sincerely believed that

he could complete it satisfactorily.   (Exhibit P-5 at 48, 104).


## IV.  CONCLUSIONS OF LAW

### A.  §523(a)(2)(A)

A fundamental purpose of the Bankruptcy Code is to permit an honest debtor to reorder

his financial affairs and obtain a "fresh start" free from the weight of oppressive, preexisting

debt.  See, e.g., In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995).  In keeping with this goal,

---

[23]     The Debtor testified in the adversary that he has no financial training or
experience.  (N.T. at 291).

[24]     The Debtor testified that his accountant prepared his taxes working from the
checkbook for the company's bank account, the relevant bank statements and the Debtor's
receipts.  (Exhibit P-5 at 14).

exceptions to discharge are construed narrowly and strictly against creditors and liberally in favor

of debtors.  See, e.g., id. at 1113; In re Ferrell, 2006 WL 1997423, at *3 (Bankr. E.D. Pa. June

14, 2006).

In seeking a determination of nondischargeability, the Plaintiff relies upon §523(a)(2)(A),

which excepts from discharge any debt "for money, property, services, or an extension, renewal

or refinancing of credit, to the extent obtained, by . . .  false pretenses, a false representation, or

actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .

."  11 U.S.C. §523(a)(2)(A).

It is the Plaintiff's theory that, to induce him to enter into a contract with the Debtor and

make payments on that contract, the Debtor made representations or failed to disclose

information that caused the Plaintiff to assume erroneously that:

    1.  the Debtor had completed similar construction work in a satisfactory
manner in the past and there were no serious complaints or lawsuits
concerning the Debtor's prior work, (Plaintiff's Reply at 4, 9);

    2.  the Debtor was a contractor with the experience and skills necessary to do
the required work and could and would timely and satisfactorily complete
the construction work, (Plaintiff's Post-Trial Opening Mem. at 5, 6, and 8;
Plaintiff's Reply at 4, 9);

    3.  the Debtor would supervise co-workers, routinely contact the Plaintiff and
return all telephone calls promptly, (Plaintiff's Reply at 4, 9);

    4.  the Debtor would be responsible for any out of pocket expenses, tools and
supplies, (Plaintiff's Reply at 4); and

    5.  the Debtor had the financial wherewithal to complete the work, had not
filed for bankruptcy previously and was not close to filing another
bankruptcy case.  (Plaintiff's Reply at 4).

To prevail on a complaint brought under §523(a)(2)(A), a creditor bears the burden of

14

proving the following elements by a preponderance of the evidence:

> 1. the debtor made a material representation of fact that he or she knew at the time was false or contrary to his or her true intentions;[25]
>
> 2. the debtor made the representation with the intention and purpose of deceiving the creditor;
>
> 3. the creditor justifiably relied on the such representation; and
>
> 4. the creditor suffered a loss or damages as a proximate cause of the false representation or act.

See, e.g., In re Antonious, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006); In re Glunk, 343 B.R. 754,

759 (Bankr. E.D. Pa. 2006); see also Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 112

L.Ed.2d 755 (1991) (regarding preponderance standard); In re Cohn, 54 F.3d at 1114 (same).[26]

---

[25]   A creditor may also succeed in establishing that a debt is nondischargeable under §523(a)(2)(A) by proving that the debtor failed to disclose a material fact. "Deceit, deliberate nondisclosure, or the omission of material facts [may] render[] a debtor as culpable as an intentional false affirmation." In re George, 1991 WL 208818 at *5 (W.D. Pa. Oct. 8, 1991); see also In re Docteroff, 133 F.3d 210, 216 (3d Cir. 1997) (reasoning that finding of fraud for purposes of §523(a)(2)(A) may be predicated on debtor's failure to disclose material fact).

[26]   On its face, §523(a)(2)(A) provides three options for proving a debt non-dischargeable: "false pretenses," "false representations," and "actual fraud." Consistent with this express language, some courts passing upon the meaning of §523(a)(2)(A) have held that the use of the word "or" in the statute "demonstrates that [the three options] embody somewhat different concepts." See, e.g., In re Barnaby, 2007 WL 750332, at *1 (Bankr. D.N.J. Mar. 6, 2007); In re Ali, 321 B.R. 685 (Bankr. W.D. Pa. 2005).

The "false representation" ground requires a showing that the debtor made a "false or misleading statement about something." Barnaby at *2 ; The second option, "false pretenses," requires proof of an implied misrepresentation promoted knowingly and willingly that creates a misleading understanding of the transaction by the plaintiff. Id. at *2 (citation omitted). see Ali, 321 B.R. at 690 (false pretense involves an implied misrepresentation, as distinguished from an express misrepresentation, that creates or fosters a false impression). Finally, there is some uncertainty whether third option, "actual fraud" is more expansive than a false representation. See id. at 690-91 (citation omitted) (citing cases for and against proposition that actual fraud "includes any surprise, trick, cunning, disassembling [sic], or unfair means by which another is

Intent is a required element of §523(a)(2)(A).  See, e.g., In re Ojeda, 2008 WL 1883221, at

*11 (Bankr. N.D. Ill. Apr. 22. 2008) ("[a]ny cause of action under §523(a)(2)(A) -- false pretenses,

false representation, or actual fraud -- requires proof that the debtor acted with intent to deceive").

Determining whether a debtor had the requisite fraudulent intent to warrant an exception to

discharge is a subjective inquiry.  Field v. Mans, 516 U.S. 59, 70-72, 116 S.Ct. 437, 444, 133

L.Ed.2d 351 (1995).  A creditor may prove such fraudulent intent by direct, as well as

circumstantial, evidence.  "Where a person knowingly or recklessly makes false representations

which the person knows or should know will induce another to act, the finder of fact may logically

infer an intent to deceive."  In re Ojeda, 2008 WL 1883221, at *11(citation omitted).  Intent and

knowledge may be inferred based on the "totality of the circumstances."  See In re Cohn, 54 F.3d at

1118-19.  Finally, "[t]o be actionable, the debtor's conduct must involve moral turpitude or

intentional wrong:  mere negligence, poor business judgment or fraud implied in law (which may

exist without imputation of bad faith or immorality) is insufficient."  In re Schwartz & Meyers, 130

B.R. 416, 422 (Bankr. S.D.N.Y. 1991).

With the foregoing principles in mind, I will analyze each of the Plaintiff's asserted

instances of fraud, misrepresentation and false pretenses.

---

treated").

In this proceeding, although the Plaintiff makes reference to "actual fraud" in his
post-trial submissions, all of the evidence he marshals involves either what he depicts as either
misrepresentations or implied misrepresentations.  Therefore, I will analyze his claims as false
pretense and false representation claims under §523(a)(2)(A).

**1.  Whether the Debtor intended to abide by or complete the contract.**

It is a matter of well-entrenched jurisprudence that a contractor's failure to perform as promised, standing alone, gives rise to a case for breach of contract, <u>not</u> actionable fraud, misrepresentation or false pretenses under §523(a)(2)(A).  <u>See, e.g.</u>, <u>In re Antonious</u>, 358 B.R. at 182 ("mere breach of a construction contract alone does not establish fraud or misrepresentation for purposes of section 523(a)(2)(A)").[27]  Were it otherwise, almost <u>any</u> debt arising out of a failure to complete a contract would be nondischargeable "and that is clearly not the way the statute is written or intended."  <u>In re Barr</u>, 194 B.R. at 1019.  Instead, "to be actionable as fraud, the plaintiff must establish that the debtor entered into the contract with the intent of never complying with its terms."  <u>In re Maurer</u>, 112 B.R. at 713.

The Plaintiff contends when the Debtor entered into the Scope of Work Agreement, he did not intend to perform it or, at least, did not intend to complete it.  (<u>See, e.g.</u> Plaintiff's Reply at 10-11).  This is not what the evidence established, however.  To the contrary, I am persuaded by the weight of the evidence that when the Defendant entered into the Scope of Work Agreement with the Plaintiff, he expected to complete the remodeling work in a satisfactory and timely manner and

---

[27]    <u>See also</u> <u>In re Mills</u>, 345 B.R. 598, 604 (Bankr. N.D. Ohio 2006) ("Alone, a broken promise will not establish the existence of any intent to deceive"); <u>In re Barr</u>, 194 B.R. 1009, 1017 (Bankr. N.D. Ill. 1996) ("language in a sales contract stating that a contractor will build a home in good and workman like manner according to specifications does not amount to a misrepresentation merely because the contractor breaches that promise"; "[f]ailure to fulfill a contract obligation by itself does not establish a misrepresentation for purposes of §523(a)(2)(A)"); <u>In re Maurer</u>, 112 B.R. 710, 713 (Bankr. E.D. Pa. 1990) ("[i]t is well established that a finding of fraud cannot be premised on a mere breach of contract.  Instead, to be actionable as fraud, the plaintiff must establish that the debtor entered into the contract with the intent of never complying with its terms").

believed that he could do so.  In reaching this determination, I credit the Debtor's testimony from

his 2004 examination that whenever he entered into a contract for a new home improvement job,

he reasonably believed he could complete the work he agreed to do.  (See Exhibit P-5 at 48, 104).

This is by no means the only evidence I rely upon in making this finding, however.

Recognizing that a Debtor will rarely admit to fraudulent knowledge or intent, and

applying a "totality of the circumstances" approach, I have also scrutinized the record carefully for

circumstantial evidence concerning the Debtor's knowledge and intent.  As the court noted in In re

Rahrig, 373 B.R. 829 (Bankr. N.D. Ohio 2007):

> An often employed indicia, especially with respect to fraudulent actions
> under §523(a)(2)(A), centers on a debtor's subsequent conduct. Of
> particular evidentiary weight in this regard, especially in situations such as
> this involving a debtor/contractor, is whether the debtor undertook any of
> the steps necessary to perform as promised.  In this way, a type of inverse
> relationship can be found.  On the one side, a debtor acting with intent to
> defraud will usually not undertake any significant measures toward the
> performance of their obligation. Conversely, the opposite is also logically
> true -- when a debtor undertakes significant steps to perform as promised,
> inferences of fraud are muted.

Id. at 834 (citations omitted); accord In re Mills, 345 B.R. at 605

Here, the Debtor, through his sole proprietorship, began work at 22 Clare Drive promptly,

performed that work continuously for almost four months, and continued to work, to some extent,

in May.  The Debtor committed manpower to the job (i.e., Mike and Mal and the Debtor in April),

purchased and installed some of the materials required by the agreement, and completed some of

the work.  I do not believe this committed level of contractual performance paints the portrait of a

contractor who had no intentions of living up to his contractual obligations or one who did not

believe he had the capacity to do so.

Furthermore, that the Debtor did not ultimately complete the remodeling work does not

indicate, in and of itself, that he never intended to complete it from the outset.[28]

The cornerstone of the Plaintiff's case concerning the Debtor's knowledge or intent was the six aforementioned homeowners who filed proofs of claim in the Debtor's bankruptcy case. The Plaintiff's argument at trial was essentially that these proofs of claim constitute "similar failed projects" and, combined, establish that the Debtor had the "habit" or "pattern" of inducing homeowners to hire him and pay a deposit on home improvement work that he never intended to and never did complete.  (See Plaintiff's Reply at 6, 10).  Plaintiff contends these claims provide compelling evidence of the Debtor's fraudulent knowledge and intent.

I disagree.  The mere existence of these proofs of claim does not demonstrate either that the Debtor had a "habit" of defrauding homeowners or that he did not intend to complete the remodeling work that he promised to do for the Plaintiff.

To begin with, and as I ruled at trial, I do not find these six claims establish that the Debtor had a "habit" for the purposes of Federal Rule of Evidence 406.[29]  Rule 406 provides that:

---

[28]      See, e.g., In re Douglas, 2007 WL 135640 (Bankr. D. Kan. Jan. 12, 2007) (declining to infer intent from contractor's failure to complete work; failure to complete job, standing alone, is insufficient to establish intent not to finish job at inception of contract; "If Douglas had intended to take Evans money and not perform, why did he do as much work as he did?"); In re Bowden, 326 B.R. 62, 87 (Bankr. E.D. Va. 2005) ("[A]ny subsequent conduct that is contrary to the original representation does not necessarily indicate that the original representation was false."); In re Green, 296 B.R. 173 (Bankr. C.D. Ill. 2003) ("Subsequent inconsistent conduct, although admissible as circumstantial evidence of prior intent, does not necessarily control the determination of whether the debtor had the intent to deceive, for non-dischargeability purposes"); see also  In re Horton, 372 B.R. 349, 357 (Bankr. W.D. Ky. 2007); In re Baker, 139 B.R. 692, 694 (Bankr. N.D. Ohio 1991).

[29]      The Debtor objected to the Plaintiff's proffer of evidence regarding the six homeowners who filed proofs of claim on the grounds that it was irrelevant and also argued the issue of whether such proofs constituted inadmissible character evidence.  (N.T. at 57-63).  With respect to the Plaintiff's efforts to admit this evidence through his expert, the Debtor also

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

"Habit" has been defined as a person's "regular response to a repeated specific situation."[30] The Advisory Committee Notes provide, as examples of habit, the practices of "going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving." Id.

To support an inference that a particular response has become a defendant's habit, the plaintiff must produce evidence establishing a "degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct

---

objected on the grounds that the Plaintiff's expert did not have any specialized knowledge that would assist the court in understanding and/or assessing the claims asserted by these homeowners. (N.T. at 96-98). In response, the Plaintiff contended that this evidence was admissible under Federal Rule of Evidence 406 regarding habit. (See, e.g., N.T. at 110-1).

I ruled that I would not permit Mr. Scherf to testify regarding habit testimony due to his inability to put these six cases in a larger content that would permit an inference that the Debtor's alleged behavior in six (6) instances rose to the level of a "habit." (N.T. at 114-119). The reasons for the ruling are elaborated in the text, infra.

I also ruled that unless the Plaintiff could establish that Mr. Scherf had somehow brought his expertise as a forensic accountant and fraud examiner or knowledge of the residential construction industry to bear with respect to the factual allegations in the homeowners' proofs of claim and/or affidavits, I would not permit Mr. Scherf to testify regarding those facts and thereby place in the record otherwise inadmissible hearsay evidence. (N.T. at 120); see Fed. R. Evid. 702. I did not preclude the Plaintiff from calling the individual homeowners to the witness stand, but they were not called to testify.

Notwithstanding these rulings, Mr. Scherf testified at length on a variety of subjects without objection. (See N.T. 145-158, 175-206).

[30]     Advisory Committee Notes, Federal Rule of Evidence 406.

that is 'semi-automatic' in nature."  Simplex, Inc. v. Diversified Energy Sys., Inc., 847 F.2d 1290,

1293 (7th Cir. 1988).  Furthermore, the case law warns that habit evidence "is never to be lightly

established, and evidence of examples, for purposes of establishing such habit, is to be carefully

scrutinized before admission."  Dover-Hymon v. Southland Corp., 1993 WL 419705 at *4 (E.D.

Pa. 1993).  As the court noted in Mobile Exploration & Producing U.S., Inc. V. Cajun Const.

Servs., Inc., 45 F.3d 96 (5th Cir. 1995):

> To obtain a Rule 406 inference of the routine practice of a
> business, a plaintiff must how a sufficient number of specific
> instances of conduct to support that inference.  Reyes [v.
> Missouri Pac. R. Co., 589 F.2d [791,] 795 [5th Cir. 1979]
> ("Although a precise formula cannot be proposed for
> determining when the behavior may become so consistent
> as to rise to the level of habit, 'adequacy of sampling and
> uniformity of response' are controlling considerations.")
> (quoting Fed.R.Evid. 406 adv. comm. notes)).  Evidence
> of the defendant's actions on only a few occasions or only
> in relation to the plaintiff are not enough; the plaintiff
> must show regularity over substantially all occasions or with substantially all
> other parties with whom the defendant has had similar business transactions.

Id. at 99-100.

Accordingly, to establish that the Debtor had a "habit" of incurring contract debt on the

basis of false pretenses, it was the Plaintiff's burden to produce sufficient evidence to permit me to

critically examine the ratio of customer reactions to the universe of the Debtor's contracts as well

as to prove the similarity between the six claims and the Plaintiff's situation.  The Plaintiff failed to

do either.  The record the Plaintiff made concerning the circumstances underlying these other

homeowners' proofs of claim was vague at best and presented only second-hand through the

descriptive (non-expert) testimony of his Mr. Scherf.[31]  The evidence did not quantify  the universe

of jobs for the time period to which the proofs of claim related (i.e., 2002-2006).  Nor did the

evidence establish whether all of the other claims involved incomplete jobs.[32]  For these reasons

the evidence cannot support a finding of regularity of response.[33]

The same failures of proof that result in the Plaintiff's not having established habit also

_____

[31]      Even the Plaintiff's expert's source of information was limited.  He testified that
he reviewed most of the Debtor's 2004 examination, the proofs of claim and the bankruptcy
pleadings. (N.T. at 89 (regarding having reviewed "most" of the 2004 examination), 90-91, 251-
254).  He also reviewed an affidavit from Mrs. Anderson and interviewed her.  (N.T. at 253, 145,
182).

The only other evidence that the Plaintiff produced at trial that would permit me
to draw any conclusions about these other disputes or litigation is the Debtor's Rule 2004
examination.  I have also taken judicial notice of the proofs of claim filed in the Debtor'
bankruptcy case.  None of the homeowners were called to testify.

This universe of evidence is not sufficient to permit me to draw any detailed
conclusions about the specific nature of some of these disputes (precisely what work was
involved, what the homeowner's complaint was, what the Debtor's response or defenses were,
when the Debtor was retained to do the particular job, whether any work had been done, whether
the dispute concerned the quality of the Debtor's work or whether he completed the work, etc.) or
other pertinent information beyond that contained the Findings of Fact.

[32]      Given that the Plaintiff was attempting to show a pattern or habit of fraudulently
inducing homeowners to enter into contracts that are never completed, whether the other
homeowners' claims relate to incomplete jobs is relevant to establishing that pattern.  There was
a failure of proof in this regard except with respect to two (2) homeowners.  First, Mr. Scherf
testified that in Ms. Anderson's counterclaim to complaint filed by the Debtor, she alleged that
the Debtor failed to complete work on her home.  (N.T. at 183).  The other possible exception
relates to the Stumpo proof of claim.  Given the Debtor's testimony that he ran out of the funds
needed to complete the work he had contracted to do for the Stumpos, I can infer that the Stumpo
proof of claim relates to a contract the Debtor did not complete.

[33]      To the extent Mr. Scherf proffered the opinion that the Debtor engaged in a
pattern of incurring contract debt on the basis of false representations (N.T. at 214, 216), I find
that opinion unpersuasive based on the same inadequacies described in the text above.

derail the Plaintiff's efforts to prove that the existence of these proofs of claim establish, circumstantially, that the Debtor acted with the requisite fraudulent knowledge and scienter with respect to the Plaintiff's contract.  The record does not tell me whether the Debtor caused these homeowners to assume falsely that he intended to complete their contracts, and then, with the requisite intent, breached his promise.  Nor does it establish that each of the six claims involves incomplete contracts.

Accordingly, considering the foregoing, I conclude that the Plaintiff has not met his evidentiary burden of proving that the Debtor, at the outset, did not intend to complete his remodeling contract with the Plaintiff and acted with this knowledge and fraudulent intent to defraud the Plaintiff.

### 2.  Whether the Debtor made other misrepresentations, fostered false pretenses or engaged in fraud.

In addition to endeavoring to prove that the Debtor intended at the outset not to complete the Scope of Work Agreement and misrepresented that intent, the Plaintiff also contended that the Debtor told him certain things during the course of contract negotiations that were material to the Plaintiff's decision to hire him and that turned out to be false and that the Debtor caused him to form certain ideas about the Debtor and the remodeling project that were also false.  The Plaintiff proffers this alleged conduct as alternative grounds to sustain a finding that the Plaintiff is entitled to a §523(a)(2)(A) exception from discharge with respect to his state court judgment against the Debtor.

### a. the Debtor's reputation and work experience

The first such alleged misrepresentation relates to the Debtor's general reputation and work experience. The Plaintiff claims the Debtor led him to assume falsely that the Debtor had completed similar work in a satisfactory manner and that there were no serious complaints or lawsuits concerning the Debtor's prior work. (Plaintiff's Reply at 4, 9).

According to the evidence, before the Plaintiff signed a contract with the Debtor, the Debtor told him merely that "he had done prior construction projects, similar projects finishing basements" and "it had generally been accepted as good quality work." (N.T. at 28, 33). In attempting to paint this statement as a §523(a)(2)(A) misrepresentation and pair it with a material omission, the Plaintiff relies on the proofs of claim discussed above. The Plaintiff accuses the Debtor of hiding his "extensive and sordid history of contracting failures and resulting litigation and bankruptcy" -- purportedly established by these proofs of claim -- by remaining silent about them in his pre-contract discussions with the Plaintiff. (Plaintiff's Reply at 14).

The Plaintiff's argument is flawed. To start, the Plaintiff's theory flows from and necessarily depends upon his erroneous assumption that, prior to January 2004, there were "serious complaints or lawsuits" by six homeowners. (Plaintiff's Post-Trial Reply at 4; N.T. at 36). Viewing the evidence regarding these other proofs of claim, as limited as it is, from a temporal perspective, the relevant timeline[34] appears to be:

---

[34]     This is merely a timeline produced to test the sufficiency of the evidence regarding when a particular "dispute" might have arisen or when a lawsuit was filed. I make no finding concerning the merits of these claims.

24

- **October 2002**: Lyn Anderson retained the Debtor. (N.T. at 176, 267).

- ***January 2004: the Plaintiff retained the Debtor.***[35]

- **Sometime <u>after</u> January 2004**: the Debtor sued Ms. Anderson for nonpayment and Ms. Anderson files a counterclaim. (N.T. at 267, 296). At the time the adversary was tried, the case was still in litigation. (N.T. at 253).

- **March 15, 2004**: The Vaughns contend that the Debtor incurred a debt to them on this date.[36]

- **June 2004**: Mr**.** Spence apparently retained the Debtor, the first step in the process allegedly resulting in his obtaining a judgment against the Debtor in November 2005.[37]

- **April 15, 2005**: James Steiner allegedly obtained a judgment against the Debtor for "deposit for services." (<u>See</u> Proof of Claim No. 10).

- **January 10, 2006**: the Debtor allegedly incurred a debt to Bonnie and Roger Stumpo.[38]

- **2005 or 2006**: the Debtor did work for Jeffrey and Elizabeth Tinney, who later asserted a proof of claim in his bankruptcy case.[39]

---

[35]    Statement of Uncontested Facts No. 6.

[36]    <u>See</u> Proof of Claim No. 2.

[37]    <u>See</u> Proof of Claim No. 11.

[38]    <u>See</u> Proof of Claim No. 8.

[39]    <u>See</u> Exhibit P-5 at 109; N.T. at 219. The Plaintiff presumably learned about the Tinneys from the Debtor's amended bankruptcy schedules. (<u>See</u> Bankruptcy Docket Entry No. 39).

There was also testimony at trial about a suit by F&F Customer Builders. (N.T. at 194). Apparently, F&F were the original contractors that the Stumpos hired and, after the Stumpos fired F&F and retained the Debtor, F&F sued the Debtor for tortious interference with

This evidence fails to prove the existence of six pre-January 2004 complaints or lawsuits. At best, it supports an inference that one of these cases -- i.e., the Anderson claim -- had more likely than not reached the stage of being a "dispute" pre-January 2004. Indeed, that inference is consistent with the Debtor's testimony. (N.T. at 296 (naming Anderson as only potential "problem" pre-January 2004)). The record is wholly insufficient to permit me to draw any conclusions regarding when the Vaughns, Mr. Spence or Mr. Steiner reached the "dispute" stage in their discussions with the Debtor and proves that the Stumpo and Tinney jobs came after the Plaintiff's.

Putting this problem aside, however, even if the Plaintiff had produced evidence sufficient to establish that the Debtor had six (6) outstanding disputes at the time he was negotiating with the Plaintiff, the existence of those disputes alone would not meet the Plaintiff's burden of proving that the Debtor's representation that "he had done prior construction projects, similar projects finishing basements" and "it had generally been accepted as good quality work" was false or that the Debtor believed it to be false. That is because the Debtor's statement was not so sweeping as to purport to represent what his experience has been with all of his customers and because the existence of six hypothetical disputes would not negate the existence of satisfied customers.[40] Indeed, the Plaintiff testified that he spoke to one such customer before hiring the Debtor. (N.T. at 69).

Turning back to the Anderson matter which, more likely than not, had reached the stage,

---

contract. (Exhibit P-5 at 106-07).

[40]     The Debtor's uncontradicted testimony was that from 2002 through 2004, he was employed on 50 jobs. (N.T. at 297). Had the Plaintiff been able to prove that the Debtor had six customers with whom he had contract disputes, that would comprise only 12 percent of the universe of the Debtor's work.

prior to January 2004, that it could be considered a dispute, I find that:

1. The Debtor's knowledge of this <u>one</u> disagreement (which did not mature into litigation until <u>after</u> the Plaintiff retained the Debtor and, even then, only at the Debtor's behest) does not prove that his statement that "he had done prior construction projects, similar projects finishing basements" and "it had generally been accepted as good quality work" was false.

2. There is nothing in the record that establishes that the Debtor did anything to foster the Plaintiff's subjective belief the Debtor had never had <u>any</u> complaints regarding his work or that he was on notice that the Plaintiff was operating under this belief.[41]

4. The Plaintiff presented no authority for the proposition that the Debtor had a duty to volunteer information regarding the one dispute that might have existed at the time the parties formed their contract.[42]

5. To the extent the Plaintiff assumed that a contractor, who had worked for some time in the industry, would not have had a single customer "dispute" or "complaint," I find that assumption to be unreasonable and any reliance upon it unjustified.[43]

---

[41]    The Plaintiff never asked the Debtor whether he had ever had any problems or disputes with his customers and therefore, I find that the Debtor did nothing to foster any such assumption that the Plaintiff may have had.  These facts negate that the Debtor had any intention to deceive the Plaintiff.

[42]    To prove fraud by silence, a creditor has a duty to show that the defendant had the requisite knowledge and a duty to speak.  <u>See, e.g.</u>,  <u>In re Ozarowski</u>, 2006 WL 3694547at *5 (Bankr. D.N.J. Dec. 12, 2006).  The Plaintiff has cited no authority to establish a duty on the Debtor's part to volunteer information about this one dispute nor authority to establish when or if there is some point at which the number of disputes with prior customers reach a level that creating an affirmative duty to disclose their existence to every future customer.

[43]    The Plaintiff's own expert testified that a reasonable homeowner as to whom such information would be material would inquire whether a contractor had problems on prior jobs. (<u>See</u> N.T. at 258-9; see also  N.T. at 143 ("[i]f the Debtor was silent on it, [and] the person didn't ask, you know, one of the issues might be that the person should have asked.").

Finally, also falling within the category of the Plaintiff's challenges to the Debtor's reputation, the Plaintiff's expert testified that the fact that the Debtor has done business under different names over the years could be considered indicia of fraud, the implication being that the Debtor might have changed names to avoid a poor reputation associated with an earlier name or to avoid liability. (N.T. at 209-213). I infer from this testimony that it is the Plaintiff's position that the Debtor's act of changing the names under which he did business is circumstantial evidence of the Debtor's knowledge that he did not have a good reputation in the business and renders false his representation that he had done some prior renovation work that generally had been accepted as being satisfactory.

I do not find this argument convincing. First, the Plaintiff did not prove that the Debtor had a poor reputation. Nor did the Plaintiff prove that the Debtor shielded himself from liability by changing the names under which he did business -- the evidence suggests that all of the Debtor's businesses were operated as sole proprietorships. (See, e.g., Exhibit P-5 at 9; N.T. at 250). Further, the Debtor's prior business names, except Bear Builders, all included his last name "Giquinto" and, in doing business with the Debtor and/or Bear Builders, the Plaintiff knew the Debtor's name was Richard Giquinto.[44] Finally, I find the Debtor's testimony that he excised

_____

[44]    This is not a case like In re Tapper, 123 B.R. 594 (Bankr. N.D. Ill. 1991) where debtor Alex Tapper told customers his name was "Al Romano" and paraded as an experienced contractor with twenty to thirty years in the business when he was in actuality a salesman with "no more skills in construction than a child with an Erector set." Id. at 603.

    This case is also distinguishable from In re Antonious, 358 B.R. 172 (Bankr. E.D. Pa. 2006), the case upon which the Plaintiff relies heavily. There, the parties stipulated that the debtor, Mr. Antonious, held himself and his business out to the public as something he later admitted he was not -- "a general contractor engaged in the business of home repairs and construction of additions and related jobs." (Id. at 177). In truth, Mr. Antonious functioned solely as a referral agent. Id. Mr. Antonious disseminated a brochure that described him as

"Roofing" from his business name to change the existing perception that he did only roofing work and replaced "Giquinto" with "Bear Builders" due to the difficulty customers had pronouncing his last name to be credible.

### b.  the Debtor's skill level

The Plaintiff also urges me to find that he has proven the required elements of §523(a)(2)(A) with respect to his contention that the Debtor misrepresented whether he had the skills necessary to do the required remodeling work in the Plaintiff's basement.  In making this argument, the Debtor refers to the Debtor's statement that he had "experience doing basements and experience with roughing and plumbing and . . . electrical" work.   (N.T. at 35).

---

"Your Small Job Specialist" and, despite the fact that "Your Small Job Specialist" did <u>not</u> actually perform any of this work <u>intentionally misstated</u> that "Your Small Job Specialist" performed "more than 40 different types of work" and had "over 47 men to do all the basic disciplines - Carpentry, Plumbing, Electrical, HVAC, Drywall, Painting, Masonry, Handyman, etc." and was "37 Years in the Business - Licensed and Insured."  <u>Id.</u>  None of these express or implied representations were true.  In reality, Mr. Antonious paid the monies he received from the homeowner for the construction of a new addition to another man, Mr. Griffith, who, in addition to doing shoddy construction work, died before the job was completed.  <u>Id.</u> at 180.

In the end, the <u>Antonious</u> court held that the debtor owed a nondischargeable debt to the homeowners because the debtor embarked upon outright fraud in the guise of a charade: he lied about who he was and what he did, <u>i.e.</u>, the debtor held himself out as being a general contractor with 37 years in the business and 47 employees when in fact he was merely a referral agent who worked alone out of his basement.

The kind of outright fraud found in <u>Antonious</u> and <u>Tapper</u> is a far cry from the contract dispute in this case.  The evidence suggests that, at most, the Debtor presented himself and his business in a favorable light to the Plaintiff in the hopes of obtaining the job.  <u>See generally</u> <u>Castrol Inc. v. Pennzoil Co.</u>, 987 F.2d 939 (3d Cir. 1993) (distinguishing non-actionable "puffing" from false representations).

29

Although I credit the Plaintiff's testimony[45] that this representation was material to him in his decision to hire the Debtor, nonetheless, I do not find that the Plaintiff has met his burden of proof on at least two (2) of the remaining elements of §523(a)(3)(A) -- i.e., that the Debtor's statement was false, that the Debtor knew it to be false and acted with the requisite intent.

The lynchpin of the Plaintiff's argument is that the work actually completed was of poor quality.  Absent this fact, there can be no actionable misrepresentation.  On this subject, the Plaintiff testified and/or produced evidence with respect to only one issue involving the quality of work the Debtor did on the job -- he testified that the wiring that the Debtor ran throughout the basement was not to code. (N.T. at 66).  The Debtor testified to the contrary, however -- asserting that a company called Middle Atlantic was retained to inspect the wiring and that the wiring passed inspection.  (N.T. at 291-92).

Consequently, the evidentiary record on the quality of the work is in equipoise.  The evidence the Plaintiff presented, which consisted only of his own testimony, is counterbalanced by the evidence the Debtor presented, which also was comprised only of the Debtor's own word.  Both sides had the motivation to testify in a manner that best suits their case and I perceive nothing in the record that causes me to favor one witness' testimony over the other's.  Neither side presented any objective evidence, such as testimony from inspectors or from any contractor that might have been hired to fix the Debtor's allegedly faulty work.

With the evidence being equal and the Plaintiff bearing the evidentiary burden, I conclude that the preponderance of the evidence does not establish that the electrical wiring was more likely than not below code standards.  See, e.g., New Midland Plaza Assocs., 247 B.R. 877, 883 (Bankr.

---

[45]     See N.T. at 32.

S.D. Fla. 2000) (preponderance of the evidence standard means that the existence of a fact is more likely than not). Therefore, I need not analyze the issue whether the alleged sub-par work gives rise to a nondischargeable debt based on the Debtor's earlier representations regarding his skill level.

Furthermore, in light of the Debtor's experience in the industry, I am not convinced that he subjectively felt unqualified for the job but nonetheless intended to mislead the Plaintiff regarding his competence. Therefore, even if I were to resolve the electrical wiring issue in favor of the Plaintiff, his nondischargeability claim would fail.

### c. that the Debtor would supervise co-workers, routinely contact the Plaintiff, and return phone calls promptly.

In seeking to establish the nondischargeability of the Debtor's debt, the Plaintiff claims that he believed that the Debtor would be personally responsible for the basement remodeling project, would supervise co-workers on the job, and would be easy to contact and return all telephone calls promptly. The Plaintiff did not contend that the Debtor explicitly made such representations to him;[46] instead, the Plaintiff relies on the doctrine of "false pretenses" in stating his case with respect to these ideas.

A creditor may establish the nondischargeability of a debt by proving that a debtor obtained money, property or services by fostering false pretenses intended to deceive the creditor. A "false pretense" is an "implied misrepresentation or conduct which creates and fosters a false impression,

---

[46]      See, e.g., N.T. at 32 (Plaintiff assumed the Debtor would be on site most days); id. at 33 (the Debtor did not mention specifically that he would be easy to contact and return all phone calls, Plaintiff operated under that assumption); id. at 29-31 (Plaintiff was "operating under the assumption" that the Debtor and his co-worker, Mike, would be working on the job for its entirety until completion).

as distinguished from a 'false representation' which is an express misrepresentation." In re
Antonious, 358 B.R. at 181 (quoting In re Haining, 119 B.R. 460, 463-464 (Bankr. D. Del. 1990));
In re Ali, 321 B.R. 685, 690 (Bankr. W.D. Pa. 2005) (quoting Haining definition of "false
pretense").  A "false pretense" may be "any series of events, when considered collectively, that
create a contrived and misleading understanding of a transaction, in which a creditor is wrongly
induced to extend money or property to the debtor."[47]  A false pretense must be "fostered 'willfully,
knowingly, and by design; it is not the result of inadvertence.'"  In re Antonious, 358 B.R. at 182.

        The evidence the Plaintiff produced does not prove the elements of an actionable false
pretense.  First and foremost, there is no evidence that the Debtor did anything to foster these
impressions -- rather, they appear simply to be the Plaintiff's own ideas, i.e., things the Plaintiff
assumed would be true, without being told and without ever asking.  Second, the Plaintiff's
contention that having the Debtor on-site everyday was material to him is at odds with his behavior.
The Debtor did not work at the job site until April 26.  Yet, by April 15, before the Debtor had
personally done any work, and after four months of construction work by Bear Builders' other
workers, the Plaintiff had paid all but the final "due upon completion" balance on the contract
without any evidence of a complaint regarding the Debtor's absence. Additionally, the Scope of
Work Agreement retains "Bear Builders" to do the work and does not require any specific Bear
Builders worker to do all of the work or require the Debtor to be on site every day.  (See Exhibit P-

---

        [47]        See In re Antonious, 358 B.R. at 182; see also In re Barnaby, 2007 WL 750332, at
*2 (defining "false pretenses" to mean "conscious, deceptive or misleading conduct calculated to
obtain, or deprive, another of property" ); In re Ferguson, 222 B.R. 576, 586 (Bankr. N.D. Ill.
1998) ("The key character of false pretenses appears to be a series of events or communications
which collectively create a false or misleading set of circumstances in which the creditor is
wrongfully induced by the debtor to transfer property; it is multiple events done willfully,
knowingly and by design.").

1).

Plaintiff also failed to establish proximate cause.  He did not prove that he suffered a loss due to these assumptions he made.  The record is devoid of any evidence that a missed call, or unsupervised work caused the Plaintiff to incur any portion of the contract debt sought to be declared nondischargeable.

### 5.  out-of-pocket expenses, tools and supplies

The Plaintiff also accuses the Debtor of leading him to believe falsely that the Debtor would be responsible for any out-of-pocket expenses and necessary equipment.  Here, too, the Plaintiff has failed to prove a case under §523(a)(2)(A).

Putting aside the issue whether the Plaintiff produced any evidence to link the Debtor with the Plaintiff's assumptions and assuming, _arguendo_, that I were to interpret the Scope of Work Agreement as giving rise to the implied representation that the Debtor would be responsible for all "out-of-pocket" costs, no evidence was produced to establish that this representation was false, that the Debtor knew it was false when he made it and/or that its falsity was the proximate cause of the judgment debt to the Plaintiff.

The record is also devoid of any proof that the Debtor made any representation concerning tools and supplies, that Bear Builders workers came work at 22 Clare Drive without the necessary tools, or that unsupplied tools were the proximate cause of the Debtor's debt.

### 6.  financial wherewithal and bankruptcy filings

Finally, the Plaintiff contends that the Debtor misled him by creating the false impression

33

that he had the financial wherewithal[48] to complete the work at 22 Clare Drive.  He maintains that

the Debtor set about creating this false pretense by arriving at the Plaintiff's house with "a truck

with Bear Builders on the side of it loaded with construction equipment" and by telling the Plaintiff

that he had completed "prior construction projects." (N.T. at 28).   He also attributes significance to

the Debtor's failure to volunteer that he had filed for bankruptcy relief in 1997 and to provide notice

of his intention to file his 2006 bankruptcy case.

 These facts do not prove actionable fraud, misrepresentation or false pretenses.  At the

outset, I note that "the representation made by a debtor upon which a creditor predicates an action

under §523(a)(2)(A) cannot, consistent with the express language of §523(a)(2)(A) and (B), pertain

to . . . [the] debtor's financial condition; representations regarding a debtor's financial condition are

only actionable under §523(a)(2)(B) and then only if the same are made in writing."  See 11 U.S.C.

§523(a)(2)(A) and (B); In re Booher, 284 B.R. 191, 200 (Bankr. W.D. Pa. 2002).  Accordingly, if

Plaintiff's allegations regarding the Debtor's financial capabilities fall within the statutory meaning

of "financial condition," these allegations fail as a matter of law under §523(a)(2)(A).  I need not

decide that issue, however, because, even assuming that the sorts of "pretenses" the Plaintiff raises

are actionable under §523(a)(2)(A), I still do not find that Plaintiff met his burden of proof with

respect to them.

 There is no evidence that the Debtor was on notice regarding the Plaintiff's assumptions.

This tends to negate the requisite element of the Debtor's knowledge and intent.  In any event, to be

---

[48]   I describe as "financial wherewithal" the Plaintiff's broad-brush challenge to
whether the Debtor was "sophisticated enough to complete his obligations (meaning able to
prepare and manage a budget, obtain materials, tools, supplies, receive and deal with deposits,
etc.)."  (See Plaintiff's Reply at 3).

34

clear on the subject, I also conclude that the Plaintiff failed to prove that the Debtor believed that he

did not have the financial wherewithal to complete the job or that he acted with the requisite

scienter. Finally, I find the inferences the Plaintiff claims to have drawn from the Debtor's truck and

prior work to be incredible and his reliance on any such inferences unjustifiable.

I acknowledge that the Plaintiff's expert offered a theory that attempted to tie in the

Debtor's unsophisticated financial management with the failure of the Plaintiff's contract and the

elements of nondischargeability under §523(a)(2)(A).  Basically, Mr. Scherf began with his

understanding concerning how Bear Builders' finances were handled (that the Debtor did not keep a

ledger or produce financial statements and worked only from a checkbook and receipts) and

reasoned from there that the Debtor had no way to determine profits and losses.  (N.T. at 164-66).

He also pointed to the Debtor's testimony concerning the circumstances in which money would go

into and out of Bear Builders.  Generally, income the Debtor received above certain <u>de minimis</u>

amounts went directly into Bear Builders' business account.  The Debtor also made capital

contributions to Bear Builders for certain things like advertising expenses.  (Exhibit P-5 at 9).

When the Debtor needed money for household expenses, he transferred money from the business

account to his personal account to pay for them.  The risk in this practice, according to Mr. Scherf,

is that unless one knows how much of the money in the business account represents pure profit, it is

possible to live above one's means and draw out amounts for household expenses that cut into

funds needed for material costs and labor to complete contracts.  (N.T. at 164-168)  Should such a

practice ensue, it could become systemic.  (N.T. at 172 ("In order for him to continue he has to book

the next job to pull the cash in.")).

Pairing this theory with the assumption that the Debtor knew that he had been having

35

difficulty completing construction contracts (taken from the existence of the claims filed by the six

homeowners), Mr. Scherf suggested that knowledge and fraudulent intent could be inferred.  In

others words, the Plaintiff's theory is that by 2004, the Debtor had reason to know that his business

model had set him up for failure and that any new contract he entered into also could not be

completed, but could only serve as source of funding for previously underpriced jobs.  (See N.T. at

166-72; 173-4).

The problem with this theory is that it makes assumptions that the evidence does not

adequately support.

As discussed above, the details concerning the disputes underlying the other proofs of claim

are not at a level of specificity to permit me to conclude that they all concerned incomplete jobs or

that the Debtor's financial wherewithal played a role in the failure of the underlying contracts.

Further, the timeline is not such that the Plaintiff's job fell in line behind a strong line of previously

uncompleted jobs and, accordingly, cannot be relied upon as circumstantial of the Debtor's belief

that he lacked the financial wherewithal in January 2004 to complete the Plaintiff's job.  (See

discussion, supra, IV.A.2.a).  Indeed, I find no evidence establishing that the Debtor believed that he

did not have the financial resources to finish it.

In concluding that the preponderance of the evidence fails to establish that the Debtor acted

with the requisite scienter, I also find persuasive certain observations another court made in the

context of a §523(a)(2)(A) dispute:

> It is not an uncommon occurrence for many businesses, as they
> begin their slide into insolvency, to use funds received from one
> project to pay for another.  Obviously, such a practice cannot be
> condoned.  Yet, alone such a practice does not establish that a
> debtor acted with the intent to defraud.

> Rather, the pertinent question still comes down to the debtor's
> subjective intent at the time when they were allocating the funds
> received from one project to pay for another.  Ergo, if done as a stopgap
> measure for the express purpose of salvaging the business, then
> regardless of the soundness of the business decision, it cannot be
> viewed as fraudulent.

Mills, 345 B.R. at 606.

Lastly, the Plaintiff also challenged the Debtor's failure to advise him about any possible plans he might have to file for bankruptcy in the future, (N.T. at 38, 39) and his failure to disclose his 1997 bankruptcy.  The Debtor's bankruptcy filing was made in 2006, two years after he first met the Plaintiff.  The Plaintiff has not proven by direct or circumstantial that the Debtor anticipated or contemplated this filing in 2004. The Debtor's uncontradicted testimony was that his March 2006 bankruptcy filing was made on a "24 hour basis."  (N.T. at 298).  Thus, the evidence again negates a finding that the Debtor had the knowledge and intent to deceive.  With respect to the 1997 bankruptcy, the Plaintiff never asked the Debtor whether he had ever filed for bankruptcy,  (N.T. at 68, 39), or provided any authority for the proposition that the Debtor had a duty to disclose his 1997 bankruptcy to the Plaintiff.

For all of these reasons, I hold that the Plaintiff has failed to prove the elements of §523(a)(2)(A) with respect to his allegations regarding the Debtor's bankruptcies and financial wherewithal.


**B.  §727(a)(4)(A)**

The Plaintiff also seeks a general denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4)(A).  Section 727(a)(4)(A) provides that the court shall grant the debtor a discharge,

37

"unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."

The Plaintiff bases his request for a denial of discharge on: (1) the Debtor's failure to list Ms. Anderson, the Vaughns, the Tinneys, the Stumpos and F&F as unsecured creditors (and the Anderson suit as a potential receivable) and (2) the Debtor's failure to disclose an alleged loan from his father.[49]

Section 727(a)(4)(A) is designed to ensure that the debtor puts dependable information in the hands of those interested in the administration of the bankruptcy estate without the need for the trustee or a party in interest to engage in costly, exhaustive investigations to ferret out the truth concerning the Debtor's financial condition.  See, e.g., In re Burnley, 1999 WL 717215, at *2-3 (Bankr. E.D. Pa. Aug. 27, 1999).  As such, §727(a)(4)(A) applies "not only to false statements made under sworn oath, but also to unsworn declarations under penalty of perjury, such as those made by a debtor on Official Bankruptcy Forms."  In re Burnley, 1999 WL 717215 at *2; In re Kasal, 217

---

[49]     In his Post-Trial Opening Memorandum, the Plaintiff also contended that the Debtor's testimony in this adversary that Mrs. Strominger fired him (i.e., told him not to return to the job if the tiles did not arrive by a given Thursday) constitutes a false oath.  It is doubtful that this contention is a proper subject for consideration as it was not pled in the Complaint.  The argument also suggests that the resolution of factual disputes against a debtor in contested bankruptcy court hearings should lead to a denial of discharge.  That is a broad proposition. Perhaps denial of discharge is appropriate in a case in which the debtor is found to have knowingly and purposely perjured himself or herself in trial testimony in the bankruptcy court.  I need not fine tune this analysis, however, as I find that, even if I can consider the Debtor's trial testimony at this time, the Plaintiff has not met his burden of proof.  As with the fact issue of the quality of the electrical work, I find the competing testimonial versions concerning the termination of the contract to be, at best, in equipoise.  Further, even if I were to give the Plaintiff the benefit of the doubt in resolving the fact issue as to whether the Debtor left the job or was fired, I am not convinced that the Debtor has knowingly and purposefully lied in his testimony. It is at least equally possible that the factual dispute arises from each party's selective memory of the events in the contentious final days of their contractual relationship.

B.R. 727, 734 (Bankr. E.D. Pa.), aff'd, 223 B.R. 879 (E.D. Pa. 1998); see also In re Chalik, 748

F.2d 616, 618 n.3 (11th Cir. 1984).

To prove a §727(a)(4)(A) claim, the Plaintiff must demonstrate by a preponderance of the

evidence that: (1) the debtor made a false oath or statement, (2) the debtor knew the statement was

false, (3) the debtor made the statement with the intent to deceive, and (4) the statement was

material to the bankruptcy case. See Cadle Co. v. Zofko, 380 B.R. 375, 382 (W.D. Pa. 2007);

Chusid v. First Union Nat'l Bank, 1998 WL 42292 at *7 (E.D. Pa. 1998); see also Boston

University v. Mehta, 310 F.3d 308, 311 (3d Cir. 2002) (citing Grogan v. Garner, 498 U.S. 279, 111

S. Ct. 654, 112 L.Ed.2d 755 (1991)).

Objections to discharge are liberally construed in favor of the debtor and strictly construed

against the objector.  Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993). Additionally, "'[t]he

reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and

conjectural.'" Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997) (citation omitted).  The

Third Circuit has admonished that denying a debtor his discharge "is an extreme step and should not

be taken lightly."  Rosen, 996 F.2d at 1531.  Nevertheless, if the "debtor has been dishonest with the

court or his creditors, it may be appropriate to deny his discharge, notwithstanding that the

underlying goal of federal bankruptcy law is to provide the debtor with a fresh start."  In re Spitko,

357 B.R. at 298.

In terms of the evidence needed to prove a claim under §727(a)(4)(A), the element that the

false oath be made "fraudulently" requires evidence that the debtor intended to defraud his creditors

or estate.  Id.  Fraudulent intent can be inferred from the totality of circumstances gleaned from

circumstantial evidence.  Id.  "'The requirement that a false statement is knowingly and fraudulently

made is satisfied for purposes of 11 U.S.C. §727(a)(4)(A) if the debtor knows the truth and

nonetheless willfully and intentionally swears to what is false."  Cadle Co. v. Zofko, 380 B.R. at

382 (quoting In re Dolata, 306 B.R. 97, 148-49 (Bankr. W.D. Pa. 2004).  In determining whether a

false statement was made with fraudulent intent:

> Courts may consider the debtor's education, business experience,
> and reliance on counsel . . ., but the debtor is not exonerated by pleading
> that he or she relied on patently improper advice of counsel.
> Furthermore, a debtor cannot, merely by playing ostrich and
> burying his head deeply enough in the sand, disclaim all
> responsibility for statements which he made under oath.

In re Spitko, 357 B.R. 272, 313-14 (Bankr. E.D. Pa. 2006).

   The "materiality" prong of §727(a)(4)(A) requires proof that the statement or omission

concerns the "discovery of assets, business transactions, and/or past dealings of the debtor or the

existence of property."  Chusid, 1998 WL 42292, at *8 (quoting In re Henderson, 133 B.R. 147, 150

(Bankr. E.D. Pa. 1991).   In other words, "the issue is not merely the value of the omitted assets or

whether the omission was detrimental to creditors."  Cadle, 380 B.R. at 383.

   With these principles in mind, I turn first to the aforementioned homeowner-creditors

whose existence the Debtor initially failed to disclose.  It is undisputed that the Debtor failed to

disclose the Andersons (both as a potential asset, relating to the Debtor's suit against Ms. Anderson,

and as a liability, relating to Ms. Anderson's counterclaim), Vaughns, Tinneys, Stumpos and F&F

as unsecured creditors in his initial bankruptcy schedules.  The Debtor's filings on March 8, 2006

disclosed only the Plaintiff, Mr. Spence and Mr. Steiner as unsecured creditors -- in other words,

only those creditors who had obtained a prepetition judgment.  (See Bankruptcy Docket Entry No.

1).  Furthermore, these omissions are clearly material, as they are germane to the aforementioned

purpose of §727(a)(4) and to administration of the bankruptcy estate.  The crux of the matter is

40

whether these omissions were made knowingly and fraudulently.

The Debtor offered two reasons for these omissions.  First, with respect to the Anderson

matter, the Debtor claimed that he omitted it because at the time he was filing for bankruptcy, there

was a pending offer to drop the main suit and the counterclaim in the Anderson litigation.  (N.T. at

302-303).  He claimed he consulted with his bankruptcy attorney about this development and

determined to omit this information following that consultation. (N.T. at 302-303).  With respect to

the other homeowners, the Debtor claimed that he simply misunderstood his duty to disclose.

Specifically, he conceded that he knew that the omitted creditors were dissatisfied customers at the

time of his bankruptcy filing, but stated that he did not know "what they were actually looking for"

and because he had not received a papered demand from them that would permit him to associate a

dollar amount with a claim, he assumed he had no duty to disclose them.  (N.T. at 303-4).

The Debtor did amend his schedules in July 2006 to disclose the omitted creditors.  In

response, the Plaintiff points out that, by this point, the §341 meeting of creditors had concluded.[50]

There is nothing in the record to tell me what precipitating event caused the Debtor to amend his the

schedules to add creditors in July 2006, as to opposed to some earlier postpetition date, except for

the Debtor's counsel's statement, in briefing, that "he deliberately waited to amend the schedules

until he was certain that all of the claims had surfaced, both for reasons of judicial economy, and to

save Defendant the cost of possibly having to file multiple amendments."  (Defendants Post-Trial

Mem. at 11).  The Debtor urges to me consider, however, that following his voluntary amendment

to his schedules (on July 20, 2006, Bankruptcy Docket Entry No. 39), he consented to a generous

---

[50]      According to the bankruptcy docket, the meeting of creditors was held on April
26, 2006, May 15, 2006 and June 16, 2006.

extension of time for motions to dismiss and §727 motions to be filed in his main bankruptcy case

(i.e., until November 25, 2006). (See Bankruptcy Docket Entry No. 52 at ¶6; Bankruptcy Docket

Entry 60).[51]  I also note that the Debtor provided information about these other homeowners at his

2004 examination.

I do not condone the Debtor's failure to list all of his known unsecured creditors.  The

Debtor had an obligation to disclose his creditors regardless of whether the debts he owed were

disputed, unliquidated or required him estimate the amounts of his creditors' claims.  Further, I am

troubled by the Debtor's failure to list the Stumpos, in particular.  At his 2004 examination, taken in

September 2006, the Debtor testified that the Stumpo job was the "last straw" and a precipitating

factor in his decision to close Bear Builders and file for bankruptcy.  (See Exhibit P-5 at 31-32).

What is more, the Debtor testified at his 2004 examination that prior to his bankruptcy, the Stumpos

had sued him in state court, which means that in March 2006 when the Debtor was preparing his

bankruptcy filings he did have some document (i.e. the complaint) that would constitute a demand

for certain amount of money.  (Exhibit P-5 at 32-33).  The Debtor's initial nondisclosure of the

Stumpo claim is inexplicable and gives me considerable pause.

Nonetheless, having considered carefully the totality of circumstances surrounding the

Debtor's omissions, I am not convinced by a preponderance of the evidence that the Debtor

possessed the requisite scienter when making these false oaths.

---

[51]     The Plaintiff misunderstands the nature of these filings, characterizing them as the
Debtor's efforts to "enforce the deadline to file dischargeability complaints against creditors who
had not timely commenced adversary proceedings."  (Plaintiff's Post-Trial Opening Mem. at 14
n.1).  In fact, the filings were generated by: (1) a motion filed by the Trustee, with the consent of
the Debtor, to extend the deadlines and (2) a Consent Order, which I approved, that resolved the
motion.

I start with the proposition that exceptions to discharge are to be strictly construed and that a denial of discharge is a serious remedy that should not be granted readily.  A party "objecting to discharge must show that the information was omitted for the specific purpose of perpetrating a fraud and not simply because the debtor was careless or failed to fully understand his attorney's instructions."  In re Kelly, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992).  As one court observed:

> Denial of discharge is reserved for the truly pernicious debtor.  Only where there is a preconceived scheme to thwart the rights of creditors and the process of this court, or such a cavalier disregard of duty as to constitute the legal equivalent of those motives, is the discharge withheld.

Id. at 462.

Further, while an amendment cannot expunge the falsity of an oath, voluntary disclosure through amendment is still relevant to the Debtor's subjective intent.  See Id. at 461 ("it is well established that the court may consider the debtor's subsequent voluntary disclosure as evidence of innocent intent").  Here, the Debtor amended his schedules to correct the omission and did so well in advance of the deadline for the filing of complaints under 11 U.S.C. §§523(a) or 727(a).  There is no evidence that the Debtor did not do this of his own volition or, to the state the converse, did so out of a fear of discovery.  "The fact that a debtor comes forward with omitted material of his own accord is strong evidence that there was no fraudulent intent in the omission."  In re Brown, 108 F.3d 1290, 1295 (10th Cir. 1997).

In making my determination, I am also mindful of the nature of the Debtor's omission.  As noted in 6 Collier on Bankruptcy ¶727.04[2]:

> The debtor is guilty of a false oath and may be denied a discharge by knowingly and fraudulently omitting the name of a creditor from the schedules.  It has been suggested, however, that the inference of fraudulent intent should not be readily drawn from such an omission,

43

because the debtor would ordinarily have little to gain from it, since
the omitted claim might be excepted from discharge.

Id.; see also 11 U.S.C. §523(a)(3).

Here, I find the Debtor's explanations for his omission of certain creditors' names from his

initial schedules credible, although misguided, and do not find proof in the record that the Debtor

had anything to gain from omitting these creditors, which also causes me to decline to infer intent.

See generally In re Topper, 229 F.2d 691 (3d Cir. 1956) (reversing §727(a)(4)(A) denial of

discharge where debtor testified that he failed to disclose $3,000.00 debt to his mother, $350.00

owed to two loan companies, and $146.35 owed to four retail accounts because he intended to pay

these creditors and not discharge them and where he disclosed this omitted information to his

attorney because there was no evidence that debtor had fraudulent intent).  In the end, while the

Debtor's omissions were unjustified, I find that the Plaintiff has not proven that he intended to make

false statements with the specific intent of deceiving.

Moving next to the Plaintiff's contention that the Debtor's failure to disclose a loan from

his father in his bankruptcy schedules constitutes a false oath for purposes of §727(a)(4)(A), I have

no difficulty denying this objection.  The Debtor's uncontradicted testimony at both his 2004

examination and at trial was that he borrowed money from his father for food and other household

expenses but that he did not do so pursuant to a promissory note and that he father did not expect to

be repaid.  (N.T. at 297-8; Exhibit P-5 at 70).

44

## C.  §727(a)(4)(D)

Finally, the Plaintiff's requests denial of the Debtor's discharge under 11 U.S.C.

§727(a)(4)(D).  Section 727(a)(4)(D) provides that the court shall grant the debtor a discharge,

"unless . . .  the debtor knowingly and fraudulently, in or in connection with the case . . .  withheld

from an officer of the estate entitled to possession under this title, any recorded information,

including books, documents, records, and papers, relating to the debtor's property or financial

affairs."  Id.

The Plaintiff claims that "the evidence at trial showed that at the time he filed for

bankruptcy, the Debtor was a party to at least 8 separate lawsuits filed in various Courts" and that

the Debtor "did not provide copies of these lawsuits (e.g., the complaints) to the chapter 7 trustee

when he filed for bankruptcy."  (Plaintiff's Post-Trial Opening Mem. at 15).

This claim can be disposed of summarily.  There is no evidence that the trustee either

requested that the Debtor provide copies of any documents relating to the lawsuits or that, if such a

request was made, the Debtor failed to provide the requested information.  See, e.g., In re Jacobs,

381 B.R. 147, 167 (Bankr. E.D. Pa. 2008).

## V.  CONCLUSION

To summarize, I do not find that the weight of the evidence can sustain a ruling that the

circumstances attendant to the Debtor's breach of contract make the resulting debt nondischargeable

pursuant to §523(a)(2)(A).  Nor do I find that the inadequacies in the Debtor's bankruptcy filings

rise to a level justifying the denial of his discharge.

An Order in accordance with this Memorandum Opinion will be entered.

Date:   __June 13, 2008__                    _____

                                            **ERIC L. FRANK**

                                            **U.S. BANKRUPTCY JUDGE**

### UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re    **RICHARD GIQUINTO** | : | Chapter 7 |
| **d/b/a BEAR BUILDERS,** | : | |
| | : | **Bankruptcy No.  06-10953ELF** |
| **Debtor(s)** | : | |
| _____ | : | |
| **ELAN STROMINGER,** | : | |
| | : | |
| **Plaintiff(s)** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **RICHARD GIQUINTO,** | : | |
| | : | |
| **Defendant(s)** | : | Adversary No. 06-0466 |

## O R D E R

**AND NOW**, following the trial of the above adversary proceeding and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby **ORDERED** that judgment is entered in favor of the Defendant and against the Plaintiff on all of the claims set forth in the Plaintiff's Complaint.

Date:    __June 13, 2008__                    _____

                                **ERIC L. FRANK**
                                **U.S. BANKRUPTCY JUDGE**

Counsel

**James E. Huggett**
**Attorney for Plaintiff**

**Joseph G. Washko**
**Attorney for Debtor**